| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF OCONEE | ) | |
| | ) | |
| Bradley Hieronymus, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **SUMMONS** |
| | ) | (JURY TRIAL DEMANDED) |
| Felix Barron, Ph.D., individually and in his | ) | |
| official capacity as an employee of Clemson | ) | |
| University; Alesia Smith, Executive Director | ) | |
| for Equity Compliance/Title IX Coordinator, | ) | |
| in her individual capacity and in her official | ) | |
| capacity as an employee of Clemson | ) | |
| University; Clemson University; and the | ) | |
| Board of Trustees of Clemson University, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a copy of which is attached herewith served upon you, and to serve a copy of your answer to said Complaint on the subscribers at their mailing address at Post Office Box 314, Mauldin, South Carolina, 29662, within thirty (30) days after such service; and if you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in this Complaint.

Respectfully Submitted:

S/ John G. Reckenbeil
John G. Reckenbeil, SC Bar No. 68610
LAW OFFICE OF JOHN G. RECKENBEIL, LLC
Post Office Box 314
Mauldin, SC  29662
Phone: (864) 248-0436
Fax: (864) 326-5940
Email: john@johnreckenbeillaw.com

Jeffrey D. Ezell, SC Bar No. 011877
EZELL LAW FIRM LLC
15 N. Irvine Street
Greenville, SC 29601
Phone: (864)421-0015
Email: jeff@jeffezelllawfirm.com

Dated: May 16, 2019
Greenville, South Carolina

EXHIBIT A

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | |
| | ) | IN THE COURT OF COMMON PLEAS |
| COUNTY OF OCONEE | ) | |
| | ) | |
| Bradley Hieronymus, | ) | |
| | ) | **COMPLAINT** |
| Plaintiff, | ) | (JURY TRIAL DEMANDED) |
| | ) | |
| vs. | ) | |
| | ) | |
| Felix Barron, Ph.D., individually and in his | ) | |
| official capacity as an employee of Clemson | ) | |
| University; Alesia Smith, Executive Director | ) | |
| for Equity Compliance/Title IX Coordinator, | ) | |
| in her individual capacity and in her official | ) | |
| capacity as an employee of Clemson | ) | |
| University; Clemson University; and the | ) | |
| Board of Trustees of Clemson University, | ) | |
| | ) | |
| Defendants. | ) | |

The Plaintiff, herein, complaining of the Defendants would respectfully show unto this Honorable Court as follows:

## PARTIES AND JURISDICTION

1.      Bradley Hieronymus ("Plaintiff") is a citizen and resident of Greenville County, South Carolina, and was at all times herein mentioned the Plaintiff in this action. Plaintiff is a food science and technology major within Clemson University's College of Agriculture and Life Sciences.   Plaintiff was also an hourly non-exempt student worker employee of Clemson University and the Clemson University Board of Trustees.

2.      That upon information and belief, Defendant (now known as) Clemson University ("Clemson") is at present day a municipal corporation under South Carolina Code of Laws. S.C. Code Ann 59-119-310.[1]  Before Defendant's name change, per S.C. Code 59-119-30, it was known

---

[1] "the limits of which shall consist of all lands belonging to Clemson University and cover all the territory included in a circle formed with the university building as a center, with a radius of five miles, thus making

as The Clemson Agricultural College of South Carolina.  It was created on April 20, 1888, via the

bequest of the Last Will & Testament of Thomas G. Clemson and was situated on what was known

as the Fort Hill Plantation in Oconee County, South Carolina. Therefore, venue is proper in this

Court.

> In this ('Land Grant' College) college it shall be taught all branches of study
> pertaining to practical and scientific agricultural and other industries connected
> therewith and such other studies as are not inconsistent with the terms of such
> will, the State (First Morrill Act) has heretofore expressly declared that it
> accepted the devise and bequest of Thomas G. Clemson subject to the terms and
> conditions set forth in said last will and testament and the State Treasurer has
> received and may securely hold such property, both real and personal. S.C. Code
> 59-119-10.

3.      In addition, Clemson University was the recipient of half the of State of South

Carolina "Land Grant" allotment from Congress in the Second Morrill Act. (Split with South

Carolina State University)

4.      Defendant, Board of Trustees of Clemson University[2] ("Trustees") is declared by

the South Carolina General Assembly to be a body politic and corporate, under the name and style

of Clemson University. It shall have a corporate seal, and in its corporate name it may contract for,

purchase and hold property, for the purposes of Sections 59-119-10 to 59-119-70 and may take

any property or money given or conveyed by deed, devise or bequest to said university and hold

the same for its use and benefit; provided, however, that the conditions of such gifts or conveyances

shall in no case be inconsistent with the purposes of Sections 59-119-10 to 59-119-70 and that the

board shall not by the acceptance thereof incur any obligation on the part of the State. It shall

---

the diameter of the circle ten miles, within which boundaries the jurisdiction of the corporation shall
extend".

[2] Also enumerated powers deem Defendant Board of "Trustees" of Clemson University and their successors
in office shall have perpetual control and direct the affairs of such municipal corporation. Said Board of
"Trustees" shall make such rules for the maintenance of order and provide such punishments, within the
jurisdiction above defined, by fine or imprisonment, as will keep the territory within their jurisdiction free
from nuisances and enforce the police regulations of the State.

securely invest all funds and keep all property which may come into its possession and may sell any of the personal property not subject to the trust and reinvest the same in such way as it deems best for the interest of said university. It may sue and be sued and plead and be impleaded in its corporate name and may do all things necessary to carry out the provisions of Sections 59-119-10 to 59-119-70 and may make bylaws for this purpose if it deems it necessary. (S.C. Code 59-119-60)

5.      Defendants Clemson and Trustees employ or have employed several thousands of employees, to include Defendant Felix H. Barron Ph.D. and at times as a student worker this Plaintiff.

6.      That upon information and belief, Defendant Clemson University Professor Felix H. Barron PhD ("Barron") is a resident of Oconee County, South Carolina and is/was employed by Defendants Clemson University and Clemson University Board of Trustees in the Department of Biological Sciences College of Agriculture, Forestry and Life Sciences.  Defendant Barron is being sued both in his official and individual capacities, as set forth specifically below.

7.       That Defendant Alesia Smith ("Smith") is the Executive Director for Equity Compliance/Title IX Coordinator for Clemson University, and she is being sued in her individual capacity and in her official capacity as an employee of Clemson University.

8.      That Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The express statutory means of enforcement is administrative: The statute directs federal agencies that distribute education funding to establish requirements to effectuate the nondiscrimination mandate and permits the agencies to enforce those requirements through "any . . . means authorized

by law," including ultimately the termination of federal funding. § 1682. In addition, Title IX is also enforceable through an implied private right of action.

9.      That Defendants Clemson University, Clemson University Board of Trustees, and Clemson University Title IX Coordinator have a direct contracting requirement via acceptance of federal funds and the responsibility to comply with Title IX.

10.     That the Defendants Clemson University, Clemson University Board of Trustees and Barron in his official capacity is an "employer" and are subject to Title VII, in which the prohibition against employment discrimination runs against "an employer," 42 U. S. C. § 2000e—2(a), explicitly defines "employer" to include "any agent," § 2000e(b).

11.     That Defendant Barron, under 42 U.S.C. § 1983 as stated herein, is being sued in his individual capacity.

12.     That Defendant Smith, under 42 U.S.C. § 1983 as stated herein, is being sued in her individual capacity.

13.     At all times material to this action Clemson University and Clemson University Board of Trustees have regulated the employment of all persons employed by this University, acted directly and indirectly in this University's interest in relation to said employees, and was therefore at the specific time frame as alleged below the "employer" of Plaintiff, a student worker within the meaning of 29 U.S.C. § 203(d) of the FLSA.

14.      That in 2018, Clemson University was and is a "Public Agency" under the FLSA because the entity performs related activities through unified operation and common control of a political subdivision of the State of South Carolina known as the Clemson University Municipal Corporation.

15.     During the relevant time-period, Defendants employed individuals who handled or otherwise worked on goods or materials that have been moved in, or produced for, commerce.

16.    The Plaintiff was not exempt from the minimum wage and/or overtime protections of the FLSA pursuant to 29 U.S.C. § 213(b)(1) ("FLSA"). Nor was this Plaintiff a "non-hourly compensation" student worker. As proof of his employment with Clemson University, a copy of Plaintiff's Clemson University pay record and Plaintiff's W-2 Wage statement from Clemson University from the 2018 fiscal tax year is attached hereto as Exhibit A. This Court has concurrent subject matter jurisdiction over this matter pursuant to 29 U.S.C. § 216(b).

17.    That the Plaintiff and Defendant employer are subject to the Payment of Wages Act ("PWA") of South Carolina SC Code 41-10-10 et. seq.

18.    The majority of the actions that give rise to this complaint occurred at or under the control of Defendants Clemson University and Clemson University Board of Trustees; therefore, as stated before, venue is proper in this Court.

19.    This action is brought pursuant to statutory and common law(s) of the United States and the state of South Carolina.

## INTRODUCTION

20.    This action stems from the deliberate indifference of Defendants Clemson University, its Title IX Coordinator and its Board of Trustees as it pertains to willfully failing to provide this Plaintiff who is a student and was a student worker of Clemson University, *"a high seminary of learning in which the graduate of the common schools can commence, pursue and finish the course of studies terminating in thorough theoretic and practical instruction in those sciences and arts which bear directly upon agriculture"*. Clemson University's Title IX Coordinator concluded this Plaintiff was a victim of severe and pervasive unwelcome sexual harassment by his Professor, Defendant Barron. (See Exhibit B - Clemson Title IX Office of Access and Equity Investigation). The University, its Title IX Coordinator and the Trustees all deliberately failed to take any corrective or remedial measures or actions so as to deprive this

5

Plaintiff access to educational opportunities and benefits, along with psychological damages sustained by Plaintiff as further set forth herein. In addition, Clemson University failed to pay this student worker, Plaintiff, all compensable wages due and owed to this Plaintiff under the Payment of Wages Act and Fair Labor Standards Act while working under the direct supervision Defendant Barron.

## **FACTS**

21.     That Plaintiff is a food science and technology major within Clemson's College of Agriculture and Life Science program. That this Plaintiff's field of study is in the area that Clemson was founded upon.

22.     The Plaintiff first met Defendant Barron at the Professor's on campus office on or about August 14, 2017, seeking an override to enroll in Barron's Creative Inquiry class for Fall 2017. At that same meeting, Defendant offered Plaintiff the opportunity to participate in a Protein Powder Survey ("Survey") in Fall 2017 which would allow Plaintiff to earn one credit hour with no pay; therefore, in Fall 2017, Plaintiff took the Creative Inquiry class as well as participated in the Survey.

23.     In Fall semester of 2017, Barron invited Plaintiff to attend a food science meeting in Myrtle Beach, SC between Barron, as a Clemson University Professor, and a sandwich making company. Plaintiff was asked to take notes during this meeting. It is Plaintiff's understanding Barron had taken Clemson University students on similar trips in the past. Plaintiff did not receive pay or hourly credit for this trip and meeting but believed the trip to be good experience for his future résumé.

24.     During this trip, Barron referred to Plaintiff as his "business partner." Barron told Plaintiff that he only took students he could "trust" to do the work required at these meetings.

25.     Plaintiff believed Barron told him, or insinuated, they would be staying in separate rooms; however, upon arrival at the hotel, there was only one suite that consisted of two bedrooms within that same suite.

26.     During this Myrtle Beach trip, Barron informed Plaintiff, if he worked hard then Plaintiff could be a long-term "business partner" and possibly go to Rome, Spain, Mexico or Chile for other work-related trips.

27.     In Spring semester 2018, Plaintiff did not have a class with Barron but continued work on the Survey. The Survey, however, only lasted for approximately the first three (3) weeks of the Spring 2018 semester.

28.     In a text exchange, Barron asked Plaintiff to continue working on the Survey in Fall 2018. Barron indicated Plaintiff would not receive academic credit or pay for the short work on the Survey in Spring semester 2018, but Barron told Plaintiff he would take him to lunch at Red Bowl. Plaintiff agreed and went to lunch with Barron on or about February 27, 2018. (See Exhibit C – Text Messages[3], pg. 55).

29.     During this lunch, Barron asked Plaintiff if he'd like to go on what Barron called a "business trip" to Mexico during Spring Break, March 24th – April 1st.  Plaintiff indicated he could not afford to go, and so Barron explained Plaintiff would receive $350.00 to use toward obtaining a passport and gave Plaintiff a work offer that Clemson University would pay Plaintiff $7.50 hourly for student work time[4].

30.     The day after the Red Bowl lunch, Barron (via text) started to exert control and influence over Plaintiff, beginning with inquiring "how the passport thing was going". He instructed Plaintiff to keep him updated as often as possible. In addition, Barron instructed Plaintiff

---

[3] Due to state efiling size limitations, higher resolution copies of the text messages in Exhibit C will be provided upon request.
[4] Plaintiff's 2018 W-2 from Clemson University is attached in Exhibit A.

to "hurry" and see Ms. Collins in order to get the Clemson University Travel Abroad Investigator(s) approval for a student worker trip to Mexico.

31.    On or about Friday, March 2, 2018, after Plaintiff informed Barron that he was set for a meeting with University Travel Abroad investigator(s), Barron informed Plaintiff that "we will celebrate this step with some good spaghetti and wine". This insistence is seen repeated in text messages for what Barron called a "Spaghetti Celebration" dinner at Barron's Seneca home.

32.    Each day, Barron's text messages increased in pressure for Plaintiff to stay in constant contact Barron, with the promises that purported future educational benefits would follow. On the morning of March 9, 2018, after a week where Plaintiff had other significant school requirements, Barron texted: "Hola Bradley, don't slip away from sight, this is the time to be more engaged by the day and to keep constant communication."

33.    As previously indicated, Plaintiff was required to apply through the Clemson's travel study abroad program[5] to go on the Mexico "business trip". In Mid-March, the travel abroad investigators ultimately denied Plaintiff's application stating he was "not prepared for that trip".

34.    The reasons given to Plaintiff by the two (2) Clemson University travel abroad investigators (Deborah and Mr. Uttiyo) was that during the interview, Bradley did not know where the trip was going; where the U.S. Embassy was located in relation to the hotel; where the hotel was located; or where the closest hospital was located.

35.    That it is apparent had the Clemson travel abroad investigators approved an unprepared student (as such in Paragraph 34) to travel internationally, it would have been a severe breach of the Clemson University Travel Aboard Policy (See Exhibit D – Clemson's Travel Policy).

---

[5] https://www.clemson.edu/procurement/travel/index.html sets out Clemson University's full travel policy to include Student Travel Policy. Exhibit D set forth herein is of pertinent part.

36.     Plaintiff informed Barron of the reasons why he was not approved for the international trip and expressed concerned he was not able to really converse in Spanish. As set forth in Exhibit D, significant information had to be provided by Barron in advance. Barron did not go on the Mexico "business trip" (March 24 – April 1). It would be objectively reasonable that the University travel aboard investigators significantly scrutinize any future international "business trips" of Barron with a Clemson student worker.

37.     Regardless of Clemson's denial for the Mexico "business trip", Barron informed Plaintiff that they must continue their work, as they will have another business trip to Peru[6] in mid-April. Barron made it clear hard work had to be put in by Plaintiff to prepare for the "training" of the Peru trip. Barron told Plaintiff that in addition, they had to work on Plaintiff's Spanish, and therefore under this, and other pretexts, Barron indicated Plaintiff would be required to travel to Barron's house in Seneca and work late into the night.

38.     Per Clemson University "CU Payroll", Barron was Plaintiff's supervisor and therefore had to sign approval on all Plaintiff's work hours before his timesheet could be submitted to Clemson for payment. Barron had indirect control of whether Plaintiff could get paid his wages and what hours Plaintiff could submit for renumeration.

39.     Barron was emphatic that Plaintiff's student time records NOT reflect work after 5pm and instructed and demanded alteration of Plaintiff's compensable time records. At Barron's instruction, Plaintiff only submitted time records that Barron personally altered and created that did not reflect the actual time Plaintiff worked. After Barron's "doctoring", he would only approve time records for submission that shorted Plaintiff all due and owed wages from the actual time that was truly compensable. However, what is clear is that Plaintiff, as a student worker, received

---

[6] Peru Trip was to Grupo Gloria for a food safety presentation. Grupo Gloria is an industrial conglomerate of Peruvian investments with a business presence throughout Peru, as well as in Bolivia, Colombia, Ecuador, Argentina and Puerto Rico. See http://www.grupogloria.com/quienesE.html#

hourly wage compensation paid by the ultimate employer Clemson University. A pre-altered time sheet demonstrates in Barron's own handwriting "Not after 5". (See Exhibit A)

40.     Even though Barron had an office on campus, Barron required Plaintiff to specially travel to Barron's house in Seneca for what Barron deemed "training" for the next business trip to Peru.  Work hours would extend well past 5pm as required by Barron.

41.      Upon Plaintiff arriving at Barron's home, Barron insisted on greeting him each time with a hug. Barron's inappropriate actions increased to attempted kisses on the cheek when Plaintiff would arrive.

42.     As Barron's text messages indicate, Barron wanted to dress Plaintiff in a certain manner. Consequently, during one night of work in Seneca, Barron told Plaintiff to try on eight (8) shirts, encouraging Plaintiff to change shirts in front of him. Plaintiff did as he was told, however felt all the shirts were intentionally too small and was uncomfortable with the situation.

43.     Barron told Plaintiff to try on pants, so Plaintiff left the room to try them on.  Barron told Plaintiff that he (Barron) was not only a doctor but an artist and appreciated the human body.

44.     Barron further insisted that Plaintiff be in peak fitness and began requesting Plaintiff perform "hanging abs" while Barron would watch.

45.     Barron began mentioning in text messages that he wanted Plaintiff to stay overnight at his Seneca house. To attempt to accomplish this, Barron would make Plaintiff stay late to finish work and would persist Plaintiff to drink wine that Barron provided. Even when Plaintiff would refuse additional wine, Barron would claim Plaintiff's purported "intoxication" as a way to get Plaintiff to stay later/spend the night at this house.

46.     On March 28, 2018 at 10:01 p.m., Barron texted Plaintiff after he refused to stay the night, blaming him for "not planning better working more into the night as I needed but I

understand you might not be used to this hard..." Barron would use this psychological manipulation of poor work performance on Plaintiff consistently. (Exhibit C – pg. 36).

47.    During his third work session at Barron's house, Plaintiff arrived unshaven. Barron immediately told Plaintiff he needed to shave his face. Before this Plaintiff was never made aware this was a work requirement. Plaintiff, in disbelief, did as he was told. Then without warning, Barron came into the bathroom, took the razor from Plaintiff and finished shaving Plaintiff's face. Barron then moved on to his chest and lower stomach.  Next, Barron lifted Plaintiff's boxers to view Plaintiff's penis. Plaintiff immediately jumped away, and Barron downplayed this unwelcome sexual advance by inquiring why Plaintiff did not/would not shave "down there".

48.    Plaintiff became uneasy as Barron increased his improper and unwelcomed actions but rationalized it as a powerful professor who had strong connections and big promises for his future career after college.

49.     Barron increased other unwelcome and inappropriate physical contact with Plaintiff including but not limited to: Barron would instruct Plaintiff remove his shirt so Barron could pop Plaintiff's acne[7], stressing to Plaintiff "he was a doctor" and that he had seen thousands of male body parts; Barron grabbed Plaintiff's leg above the knee while seated to try and pull Plaintiff closer to him; Barron held Plaintiff on his hips and try to pull him closer and told Plaintiff the only way to experience someone in the work world is to touch them.

50.    On one of the last work nights when Plaintiff refused to spend the night or take a shower at despite Barron's insistence, Barron told Plaintiff "he was not putting in enough effort, and not taking his work seriously". Barron explained "past students would get out of the shower without a towel and that Plaintiff was not free". At that point, Plaintiff told Barron he was not OK with Barron's shower requirements.

---

[7] Barron did this again in Peru which became irritated several days later.

11

51.     If Barron texted Plaintiff, and he did not respond immediately, Barron would get upset with Plaintiff and send additional texts with nasty controlling overtones. An example of this includes Barron's text: "…so much for following up!! Did you get my message yesterday?"

52.     Barron's inappropriate behavior continued on campus. Barron would summon Plaintiff to his office at Clemson and would ask Plaintiff to close the door. Barron would get upset or frustrated if Plaintiff did not stop by his office frequently enough or for extended visits. Barron referred to these as "escapes".

53.     Over a one-and-a-half-month period, Plaintiff was required to travel for work to Barron's Seneca home approximately eight (8) to nine (9) times.

54.     In addition, Barron's increased demands of Plaintiff's time not only affected Plaintiff's other class work, but he was not compensated properly for all the time the law deems Plaintiff working.

55.     Barron used the constant pressure in the lead up that this seven (7) day work trip to Peru, from April 8, 2018 – April 15, 2018, was going to be "a new world of business and culture with me…just stick and follow to the letter. You will be BIG if so…A new life in many unexpected ways is coming your way. Keep open minded but smart no limits" (Exhibit C – pg. 21).

56.     Barron's actions became even more controlling over Plaintiff. Barron required Plaintiff to not only miss a week of classes for the Peru trip, but demanded that Plaintiff not allow other class assignments to get in the way of him traveling to Seneca at Barron's demand.  In fact, Barron reprimanded Plaintiff as evidenced in a text, "You are capable of handing [sic] labs and reports. Do not waste your commitment today. it may look trivial to you, but to me it means this: do I trust on buying your ticket to Peru or not in the next hour or so. You can write your report in Seneca if needed. Let me know what you want to do". (See Exhibit C – pg. 41).

57.     Plaintiff did not have to go through as much for the Peru trip unlike the Mexico trip (which he was denied), by way of investigation by Clemson's travel abroad department.  Barron sent a text to Plaintiff saying, "they sent it to you. . . for you to buy international insurance". (See Exhibit C – pg. 21). Barron seemed to indicate Clemson's travel abroad department had notice of the Peru trip and approved it (due to their email to Plaintiff regarding insurance for the trip) without an interview or any investigation. However, when Plaintiff told Barron he did not receive the email, Barron replied he would "do it for you" insisting he would fill out the information.

58.     Clemson University has had a standing practice of collaborating students and faculty with the public and private sector to include those from Central and South America in order to expand and ultimately enrich the University.[8]

59.     This international "business trip" to Grupo Gloria, in Lima, Peru whereby Plaintiff assisted Barron who made presentations, on behalf of Clemson, on food safety issues. Both Barron and Plaintiff worked in Clemson apparel the entire workweek, Monday – Friday (10 hours each day from 7a.m.-5p.m. Monday – Thursday, and approximately 7.5 hours on Friday from 7a.m. to 2:30p.m.). The PowerPoint presentations that Plaintiff worked to assist to prepare, and was shown throughout the week, had clear Clemson University branding on each and every slide presented.

60.     On Sunday, April 8, 2018, at approximately 12 p.m., Plaintiff's mother drove him to Barron's Greenville apartment to meet Barron before Barron and Plaintiff rode together to the airport (as Barron insisted).

61.     At approximately 12:30 p.m., in Barron's vehicle on the way to the airport, Barron made clear to Plaintiff he did not like meeting mothers of students because they "track their kids" and he only deals with adults and didn't want to "take babies on work trips".

---

[8] http://newsstand.clemson.edu/mediarelations/cu-icar-hosts-dignitaries-from-central-south-america-caribbean/

62.     There is no doubt, based upon the insinuations of Barron's student(s) shower requirements and this statement made on way to airport, that he "didn't take babies on work trips", that there were other students in the past who've worked for Barron and Clemson in the capacity that Plaintiff was therein.

63.     The flight departing from Greenville Spartanburg airport ("GSP") left approximately 2:30pm - 3:00pm. This travel time cut across the regular work day. In addition, on both travel flights to Peru, Plaintiff was not relieved completely of his work duties as Barron repeatedly prompted Plaintiff by touching his leg or stroking his face to show him work matters and to ask Plaintiff work questions.

64.     Upon check in to the hotel in Peru, Plaintiff and Barron had separate rooms on different floors. Plaintiff's hotel room was equipped with a sauna, and Barron's was not. Barron was insistent of using Plaintiff's sauna almost every night during the trip. It should be noted Barron made it seem via his texts, he oversaw all travel plans.

65.     On or about the second night in Peru, Barron was in Plaintiff's room demanding use of the sauna. While in his room, Barron physically tried to shave Plaintiff's chest and armpit(s). Plaintiff objected and told Barron "NO". Barron then moved down toward Plaintiff's underwear and Plaintiff forcefully told him "NO" multiple times. When Plaintiff refused to allow Barron to access his genitalia from the waistband off his boxers, Barron moved his hands to Plaintiff's upper thigh and attempted to access from opening in the leg of his boxers and moved Plaintiff's boxers as such that his genitalia was exposed. Plaintiff immediately sat up and pushed Defendant away rejecting Barron's unwelcome and unacceptable sexual assault.

66.      Barron then stated, as he had previously stated before, that he was a doctor and has seen plenty of male body parts, and persisted with his sexual statements, asking if Plaintiff had

ever had an STD and how big Plaintiff's "male body part was", and stated that he (Barron) preferred to masturbate.

67.    Barron continued with his unwelcomed conduct continued. Barron brought with him to Peru three (3) shirts, two (2) pairs of pants and Calvin Klein underwear and requested Plaintiff try on all the clothes in front of him.

68.    Plaintiff, not wanting to be disrespectful, attempted to try on the clothes. Barron then requested he try on the Calvin Klein underwear. Defendant reasoned and played it off that Plaintiff should take a picture of himself so he would have a picture of his current physical condition for the future.

69.    Barron then told Plaintiff to "bulge it up!", demanding Plaintiff achieve an erection. Plaintiff refused. Then Barron, in a willful forceful manner, grabbed Plaintiff by his scrotum and testicles.  Plaintiff immediately pulled away from Barron's sexual assault.

70.    It was at this point Plaintiff in a state of disbelief, felt the enormity of the situation. He was in a foreign nation that he previously expressed to Barron via text concern because he did not speak Peruvian Spanish. (See Exhibit C – pg. 18) Plaintiff had no information on who to call or report this to in Peru. Plaintiff knew he was trapped, and there were several more days of work before his return flight back to South Carolina.  Plaintiff was forced to come to the realization he would be subjected to several more days of Barron's appalling behavior before he could make it back to the United States safely.

71.    With this all being extremely apparent, Barron's actions and behavior only worsened in Peru. As previously indicated, Plaintiff's hotel room contained a sauna and Barron's did not. Barron would use the sauna and shower in Plaintiff's room and then dry himself off while nude in front of Plaintiff. In an attempt to get Barron to stop the inappropriate sexual advances,

Plaintiff told Barron it was "not cool" to dry himself off in front of another. However, Barron persisted.

72.     On the last work night of the Peru trip (Friday), Barron named it "Celebration Night" and proceeded to consume a lot of alcohol. He told Plaintiff he wanted the two of them to "communicate telepathically like in movies." Barron then discussed a movie in which two guys communicated telepathically and could make the other orgasm by telepathic communication.

73.     Then while in the hotel room, Barron, intoxicated, started to forcefully attempt to pull down and off Plaintiff's sweatpants. Plaintiff resisted to hold them up, Barron began fighting him even harder trying to get them down.

74.     Barron, being unsuccessful in getting Plaintiff's sweatpants off, then told Plaintiff to take a nude photo of himself. When Plaintiff refused, Barron again attempted to forcefully remove Plaintiff's clothing.

75.     Upon Barron's unsuccessful attempts in forcefully removing Plaintiff's clothes, and not persuading Plaintiff to take a nude photo, Barron repeatedly asked Plaintiff, "why he was not ok showing him his dick". Barron proclaimed it was for "art's sake" because Plaintiff reminded Barron of Michelangelo's "David".

76.     Barron's unwelcomed sexual advancements continued through text messages with Barron texting Plaintiff things such as: "Love You"; "Love you pendejito. Repeat back"; "Missing you at my table already"; "Do you love me Flaquito?" Barron demanded Plaintiff reply with the same. Plaintiff had no other choice but not to alienate Barron out of fear being in a foreign country without any assistance. (Exhibit C - pgs. 9-11)

77.     On the last day in Peru, April 15, 2018, Barron told Plaintiff Clemson would not pay for two (2) hotel rooms and thus Barron had to stay in Plaintiff's room. That day after lunch, Plaintiff was exhausted and attempted to take a nap but was awakened to Barron in his bed twisting

Plaintiff's hair in his fingers, caressing his body, kissing Plaintiff's ear and whispering, "we have something special". Plaintiff immediately jumped out of his bed and went to the bathroom.

78.     Once Plaintiff was in Peru's airport and on the trip back to the United States, he distanced himself from Barron as much as he could.

79.     Finally arriving back to GSP on April 15, 2018, Plaintiff exited the terminal and got into his mother's awaiting vehicle curbside. Immediately as Plaintiff slammed the passenger door, in a massive release of frustration punched the dashboard and proceeded to tell his mother the inappropriate behavior by Barron.

80.     Within two days, Counsel for the Plaintiff reported Barron's inappropriate advances and assaults on Plaintiff to Clemson University. (See Exhibit E - Ezell letter dated April 17, 2018).

81.     In addition, on April 18, 2018, Plaintiff filed an incident/complaint form with Clemson's Office of Access and Equity. (See Exhibit F)

82.     Barron persisted with the text messages, setting forth information regarding the next "business trip" and Plaintiff's lack of response(s). (Exhibit C – pgs. 1-2; 24)

83.     Throughout the two months leading up to Peru, Barron continually boasted about the connection he had to large companies like Amazon and promises to give Plaintiff educational and career access to his world-wide connections. Barron made it clear he had significant control and influence in Plaintiff's educational future along with possible job prospects after graduation.

84.     Barron bragged that he was only one of a few people in the entire world who possessed the knowledge and expertise he claimed to possess and that by doing what Barron told him to do, which Barron referred to as "following him", the Plaintiff could be a millionaire like many of Barron's former students.

85.    After Plaintiff filed a 3-page Incident/Complaint Form with Clemson's Office of Access and Equity, setting forth by indication sexual harassment and the dates/longevity he had experienced culminating with Barron's predatorial like actions of the sexual harassment, assault & battery that took place in Peru, an investigation by Clemson's Title IX department took place.

86.    On July 19, 2018, the Title IX Coordinator of the University determined: "Dr. Barron's behavior created a hostile work environment in violation of our Anti-Harassment and Non-Discrimination Policy. Further, we find his behavior was inappropriate for a supervisor of a student worker, as well as for a faculty member of a student." (See Exhibit B - Clemson University Title IX Coordinator)

87.    Plaintiff, as a victim of this discrimination on the basis of sex, was thereafter never afforded the educational benefits that Barron promised Plaintiff he would have received from Clemson's College of Agriculture.

88.    These included several other collaborated international abroad trips that Clemson had planned via Barron with International business and Clemson's College of Agriculture. (Mexico: May 14 - May 20, 2018; June 24 - July 1, 2018) (See Exhibit C – pg. 24)

## FOR A FIRST CLAIM FOR RELIEF
### TITLE IX
**Deliberate Indifference to corrective measures for Sex Discrimination, Sexual Harassment**
*As to Defendants Clemson University; Clemson University Board of Trustees, Alesia Smith in her official capacity as Clemson University Executive Director for Equity Compliance/Title IX Coordinator*
*Injunctive Relief*

89.    That Plaintiff re-alleges and reiterates the preceding and foregoing paragraphs as if fully set forth herein verbatim.

90.    Congress enacted Title IX pursuant to its powers under the Spending Clause, U.S. Const., art. I, § 8, cl. 1. Congress enacted Title IX with two principal objectives in mind: "[T]o avoids the use of federal resources to support discriminatory practices" and "to provide individual

citizens effective protection against those practices." Title IX provides in pertinent part: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U. S. C. § 1681(a).

91.    That this Plaintiff has been conclusively found to be a victim and class member of Title IX which was so created to include, protect, and provide measurable remedy.

92.    That by Defendants' deliberate failure to provide any corrective measure to the Plaintiff himself, these Defendants so undermine and detracted from the Plaintiff's educational experience as to "effectively deny Plaintiff equal access to Clemson University College of Agriculture resources and opportunities" which has/had "a concrete, negative effect on Plaintiff's and all those similarly affected,  ability" to participate in an educational program or activity such as the collaborated international abroad trips that Plaintiff was foreclosed upon.

93.    That Clemson University Title IX coordinator July 19, 2018 conclusion of investigation of Plaintiff sexual harassment complaint of Barron, is totally and completely without any corrective measures or actions as to what Clemson University and its Title IX division will do to provide Plaintiff the protection it contract to provide upon the acceptance of Federal Funding.

94.    That Clemson University, its Trustees and its Title IX division stands at the present time, grossly deficient in providing any student, to include the Plaintiff a remedial path forward upon the determination that this student is a Title IX victim at the hands of a Clemson University professor.

95.    That Clemson University's direct failure to have an institutional corrective action remedial process that bears in direct correlation, as to provide the Title IX student victim the educational benefits paid for and sought. As it stands now, these Defendants yield a blackhole for Title IX student victim(s), that intentionally frustrates the Intent of Congress and the whole purpose

of the Title IX Legislation.

96.     That it is as a direct and proximate result of these Defendants in their official capacity having breached the contracting requirement under Title IX shall be henceforth Ordered by this Court via a Consent Decree, within a time reasonably fashioned to either: promulgate a "Title IX student victims corrective action/ measure policy" OR prospectively forfeit all Federal funding that Clemson University receives under the Title IX purview.

### FOR A SECOND CAUSE OF ACTION
### Title IX of the Education Amendments Act of 1972 ("Title IX")
### (20 U.S.C. §§ 1681–1688)
### Sexual Harassment/Sex Discrimination
*As to Defendants Clemson University; Clemson University Board of Trustees*

97.     That Plaintiff re-alleges and reiterates the preceding and foregoing paragraphs as if fully set forth herein verbatim.

98.     That Plaintiff has established: (1) he was and is a student at Clemson University, an educational institution receiving federal funds; (2) that he was subjected to harassment from his based on his sex; (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity; and (4) that this Plaintiff has been deprived access to educational opportunities and benefits.

99.     This specific physical exclusion from educational program(s) and activity(s) included the collaborated faculty-student international abroad trips that Clemson had planned with International businesses and the Clemson University College of Agriculture.

100.    That Defendants' deliberate failure to have any remedial actions for this Plaintiff specifically, a Title IX victim, to the above described, so undermined and detracted from the Plaintiff's educational experience as to effectively deny him equal access to an institution's resources and opportunities and most certainly has had a concrete, negative effect on the Plaintiff's ability to participate in an educational program or activity.

101.    That by these Defendants' total and complete disregard to the purpose of the Title IX legislation have in essence victimized Plaintiff a second time. This Clemson University, a recipient of federal funds of Title IX have a duty to protect and remedy.  In those affirmative duties the institution must eradicate the wrongdoer, "protect", but then must adjust and correct the path forward for the student, "remedy".

102.    That as a direct and proximate result of these Defendants deliberate indifference Plaintiff was denied access to the full benefits of his institutional education, on the basis of his sex, in violation of his rights under Title IX of the Education Amendments of 1972 entitling him to actual and compensatory damages in an amount to be determined by the jury.

<u>FOR A THIRD CAUSE OF ACTION</u>
**(Title VII)**
**<u>Sexual Harassment/Sex Discrimination</u>**
**<u>Hostile Work Environment</u>**
*As to Defendants Clemson University; Clemson University Board of Trustees; and Felix Barron, Ph.D.*

103.    That Plaintiff re-alleges and reiterates the preceding and foregoing paragraphs as if fully set forth herein verbatim.

104.    Title VII prohibits discrimination against any individual with respect to his or her compensation, terms, conditions, or privileges of employment "because of such individual's sex."

105.    In addition, that Title VII and Title IX have concurrent applicability in employment discrimination claims, Title IX extends to employment discrimination on the basis of gender by education institutions receiving federal funds.  Specifically:

> "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time, under any education program or activity operated by a recipient which receives or benefits from Federal financial assistance. <u>34 C.F.R. § 106.51(a)(1).</u>

106.    That the Plaintiff  has established: (1) he was a student worker  at Clemson University, an educational institution receiving federal funds; (2) that he was subjected to

harassment and/ or hostile work environment by his supervisor based on his sex; (3) the harassment was sufficiently severe and/or pervasive to create a hostile work environment; and (4) that this Plaintiff suffered an adverse employment affect, to include a constructive discharge from employment.

107.    After an investigation, Clemson University's the Title IX coordinator concluded:

> We have determined there is sufficient evidence to support some of Dr. Barron's communications to you could have been reasonably perceived as sexual in nature and were inappropriate. We further conclude the preponderance of evidence shows Dr. Barron touched you in ways that were uncomfortable for you and unwanted.
> After reviewing all of the evidence presented by both you and Dr. Barron, we have determined Dr. Barron's behavior created a hostile work environment in violation of our Anti-Harassment and Non-Discrimination Policy. Further, we find his behavior was inappropriate for a supervisor of a student worker, as well as for a faculty member of a student. (See Exhibit B)

108.    That this Plaintiff suffered an adverse action when as a result of what has been described herein, that no reasonable person in Plaintiff position would continue to tolerate the hostile work environment, sexual harassment, that his supervisor created, and made a condition of employment.

109.    Said conditional discharge affected the compensation, terms, conditions, and/or privileges of his employment with the Defendant.

110.    As a direct, actual and proximate result of the Defendants' sexual harassment, hostile work environment and discrimination, on the basis of his sex, Plaintiff is entitled to all damages afforded under both Title VII and Title IX.

**FOR A FOURTH CAUSE OF ACTION**
**Gross Negligence**
**SC Tort Claims Act**
*As to Clemson University and Clemson University Board of Trustees*

111.    That each and every allegation previously stated, as relevant, is restated verbatim.

112.    That South Carolina set forth that no political subdivision shall be liable arising from "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, *except when the responsibility or duty is exercised in a grossly negligent manner.*"

113.    That Clemson University has a separate department within the University exclusively for student and faculty travel.

114.    That it is a requirement that specific documentation be approved and completed by the investigators of this department prior to any purchase of plane tickets for international student travel.

115.    That several weeks prior to April 14, 2018, the Clemson University investigators in the travel abroad office had denied Barron's plan to take Plaintiff on an international "business trip" to Mexico.

116.    That Clemson University's investigators in the travel abroad office have established policy, procedures, guidelines and control on student and faculty international travel on who and where students travel with Professors.

117.    Every indication is that Defendant Barron has been working at the behest of Defendants Clemson University and Clemson Board of Trustees with these foreign countries' companies promoting the University programs via accomplishments and teachings of these companies visited. In fact, Clemson University touts itself on its main website with "Outreach" stating:

> From statewide research, extension and regulatory programs to student organizations, undergraduate research, class projects, service-learning, alternative breaks, mission trips and faculty efforts, Clemson is focused on serving others and identifying and solving current community needs. No matter what.[9]

---

[9] https://www.clemson.edu/outreach/

118.    That these Defendants had prior notice to April 14, 2018 that Barron had attempted to take a student who was unprepared to travel internationally aboard. That this prior trip was not approved by investigators.

119.    That indications exist that Clemson University approved this Plaintiff for the Peru trip even though he did not go through the proper investigations/interviews and/or process with the applicable investigators.

120.    That as a direct and proximate result of Clemson University's travel abroad investigators being grossly negligent in their breach of the duty owed to this Plaintiff, there was a reckless, willful, wanton, blatant disregard for the safety of Plaintiff and other students similarly situated.

121.    That as a direct result of Defendants' gross negligence it has proximately caused Plaintiff to suffer bodily injury, actual damages, anxiety, pain and suffering, emotional distress, metal anguish, embarrassment, humiliation, and irreparable damage.

### FOR A FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983
***As to Defendant Barron in his individual capacity***

122.    That Plaintiff re-alleges and reiterates the preceding and foregoing paragraphs as if fully set forth herein verbatim.

123.    That Defendant Barron was acting under the color of law and thus was a state actor.

124.     That Plaintiff was specifically harassed by Barron because of his sex, and that as set forth herein this Complaint Plaintiff was subjected to harassment that was so sufficiently severe and pervasive as to interfere unreasonably with his educational benefits and activities afforded under Fourteenth Amendment to the United States Constitution.

125.    That the findings of the Title IX Coordinator of Clemson University determined:

> Dr. Barron's behavior created a hostile work environment in violation of our
> Anti-Harassment and Non-Discrimination Policy. Further, we find his behavior

was inappropriate for a supervisor of a student worker, as well as for a faculty member of a student. (See Exhibit B)

126.    That as previously set forth herein in graphic detail, Barron's actions created not only a hostile work environment, but coupled with the sexual harassment and sexual assaults, this Plaintiff experienced an abusive environment at the hands of Barron.

127.    That Barron's willful, intentional, and reckless disregard for Plaintiff's rights under law was a substantial certainty as a result from Defendant's conduct.

128.    That Barron's hostile environment, sexual harassment/assault on this Plaintiff was so extreme and outrageous so as to exceed all possible bounds of decency that it is regarded as atrocious, and utterly intolerable in the United States, South Carolina and any other civilized community on the Planet.

129.    As a direct and proximate result of Barron's violations of the Fourteenth Amendment, Plaintiff has suffered irreparable harm, including loss of his Constitutional rights, entitling his to actual, compensatory, punitive damages along with declaratory and injunctive relief as set forth in the allegations of this Complaint.

### FOR A SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983
### Equal Protection
### *As to individual Alesia Smith*

130.    That Plaintiff re-alleges and reiterates the preceding and foregoing paragraphs as if fully set forth herein verbatim.

131.    That Defendant Smith was acting under the color of law as the Title IX Coordinator for Clemson University.

132.    That Smith by reason of the aforementioned policy, practice, custom, and usage, acts and omissions, engaged in under color of state law, Defendant Smith has deprived Plaintiff of equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth

Amendment to the United States Constitution and 42 U.S.C. § 1983 by discriminating against Plaintiff in the application of her departments acts, policies, practices, custom, usage, and corrective actions and remedies thereby treating Plaintiff on less than equal terms than those similarly situated under facts and law.

133.    Defendant Smith has enforced a policy that is both discriminatory and arbitrary and has treated Plaintiff differently than other similarly situated individuals based upon his sex.  Such treatment is a deprivation of his Fourteenth Amendment interests.

134.    As a direct and proximate result of Defendant Smith's violations of the Equal Protection Clause of the Fourteenth Amendment, Plaintiff has suffered irreparable harm, including loss of his Constitutional rights, entitling him to actual, compensatory, punitive damages along with declaratory and injunctive relief and damages as set forth in the allegations of this Complaint.

**FOR A SEVENTH CAUSE OF ACTION**
**42 USC § 1983**
**Due Process**
*As to individual Alesia Smith*

135.    That Plaintiff re-alleges and reiterates the preceding and foregoing paragraphs as if fully set forth herein verbatim.

136.    That Defendant Smith was acting under the color of law as the Title IX Coordinator for Clemson University.

137.    Due process protection requires that government employees have a fair procedural process when there is possible infringement of a fundamental right.

138.    As a direct and proximate result of the aforementioned policy, practices, and omissions, engaged in under color of state law, Defendant Smith has violated Plaintiff's clearly established Due Process rights guaranteed under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. Section 1983, in that Title IX  policies are vague, overbroad, and lack

sufficient standards and safeguards to take corrective actions/measures and provide legally required remedies to this Plaintiff. The lack of proper policy allowed Defendant Smith unbridled discretion to enforce and apply said policies in an *ad hoc* and discriminatory manner.

139.    As a direct and proximate result of Defendant Smith's violations of the Due Process Clause of the Fourteenth Amendment, Plaintiff has suffered irreparable harm, including loss of his Constitutional rights, entitling him to actual, compensatory, and punitive damages but also to include to declaratory and injunctive relief as set forth in the allegations of this Complaint.

**FOR AN EIGHTH CAUSE OF ACTION**
**The South Carolina Payment of Wages Act**
**(S.C. Code § 41-10-10 *et seq.*)**
***As to Defendant Clemson University***

140.    Plaintiff re-alleges and incorporates by reference all prior paragraphs in this Complaint as though repeated herein.

141.    The crux of the FLSA and SCPWA is, *inter alia*: (i) that all non-exempt employees such as this Plaintiff are entitled to recompensed for all time spent "working" within any given workweek; (ii) that minimum wage must be paid for all compensable time; and (iii) with the remainder of the entitled remuneration of wages that exceed minimum wage be paid as they are due and owed; and (iv) with overtime compensation paid at no less than time and half the regular rate for all hours worked in excess of 40 hours in a workweek.

142.    Contrary to these basic protections, and even after notice was given by Plaintiff, Defendant Clemson University improperly deprived this Plaintiff all wages due and owed, with all compensable time was either not accounted for, or time records altered or failed to compensate for travel and documentation preparation, or not compensated at the correct rate of pay;  therefore, triggering the FLSA minimum wage, overtime law(s) and Payment of Wages Act of South Carolina.

143.    At all relevant times, Defendant employed Plaintiff within the meaning of the South Carolina Payment of Wages Act, S.C. Code Ann. §§ 41-10-10 to 110 ("PWA").

144.    Plaintiff worked for Defendants with the clear understanding and agreement by Defendant that his compensation would be consistent with all applicable laws, including federal and state wage and hour laws. The Plaintiff's regular rate was $7.50 an hour.

145.    The South Carolina Payment of Wages Act defines "wages" to mean:

> all amounts at which labor rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or commission basis, or other method of calculating the amount. S.C. Code Ann. § 41-10-40(2).

146.    Pursuant to the PWA, "[a]n employer shall not withhold or divert any portion of the employee's wages unless the employer is required or permitted to do so by state or federal law. . . ." S.C. Code Ann. § 41-10-40(C).

147.    As a result of Defendant's unlawful policies and practices as set forth above, Plaintiff has been deprived of compensation due and owing which Defendant promised to pay in its commitment to abide by applicable wage laws and in violation of the PWA's mandate that no wages be withheld or diverted unless required or permitted under applicable law.

148.    As a direct and proximate result of Defendant's conduct, Plaintiff has been deprived of wage compensation to which he is entitled, including monetary damages in the amount of three (3) times the unpaid wages as well as costs and reasonable attorneys' fees.

### FOR AN NINTH CAUSE OF ACTION
### Fair Labor Standards Act Minimum Wage Violations
### (U.S.C. § 206 et al)
### *As to Clemson University*

149.    Plaintiff re-alleges and incorporates by reference the paragraphs above as if they were set forth herein.

150.    At all relevant times, Defendant Clemson University employed the Plaintiff as a student worker within the meaning of the FLSA.

151.    That Defendant had a pay policy which has been previously described to include a turn into pay a document that is reflective of <u>Exhibit A</u> to this Complaint.

152.    That upon information and belief this Plaintiff's time sheet does not reflect the actual hours of work in violation of the FLSA.

153.    The time spent by Plaintiff traveling to and from Barron's Seneca home was compensable time as deemed travel to special work site. Therefore, all the time Plaintiff was "suffered" to work required by his supervisor Barron was compensable under the FLSA. The Defendants' failure to account for these compensable hours makes clear a blatant disregard for the FLSA.

154.    It is deemed work performed away from the job site, if the employer knows or has reason to believe that the work is being performed, that must count the time as hours worked. (29 CFR 785.12). "*On-Duty*" In a trip away from home for work purposes, in the event the employee is unable to use the time effectively for his own purposes, it belongs to and is controlled by the employer. Therefore, even waiting time is an integral part of the job. (29 CFR 785.15).

155.    Travel that keeps an employee away from home overnight is "*travel away from home*". Travel away from home is clearly worktime, and compensable when it cuts across the employee's workday. The employee is simply substituting travel for other duties. The time is not only hours worked on regular working days during normal working hours but also during the corresponding hours on nonworking days.  (29 CFR 785.39)

156.    That <u>Exhibit C</u> to this complaint details compensable time of the above described to include travel to special work site Seneca, on duty, as a result of Barron's persistent requirements, travel away from home, Peru "business trip", all to which this Plaintiff is entitled to wages.

157.    Even after Plaintiff complained to Clemson's Office of Access and Equity of these owed wages, Defendant's failure violated, and continues to violate, the FLSA, 29 U.S.C. §§ 201 *et seq.*  The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

158.    Due to Defendant's FLSA violations, Plaintiff is entitled to recover from the Defendant compensation for unpaid minimum wages not considered by Defendant as compensable, an additional equal amount as liquidated damages, and reasonable attorneys' fees and costs of this action pursuant to 29 U.S.C. § 216(b).

**FOR A TENTH CAUSE OF ACTION**
**Fair Labor Standards Act Overtime Violations**
**(29 U.S.C. § 207 et al)**
***As to Clemson University***

159.    Plaintiff re-alleges and incorporates by reference the paragraphs above as if they were set forth herein.

160.    At all relevant times, Defendants employed the Plaintiff within the meaning of the FLSA.

161.    That at all relevant times in the period to include the workweek of the Peru trip, encompassed by this Complaint, Defendant has refused to pay overtime compensation for all hours worked in excess of forty (40) hours per workweek.

162.    Defendant violated, and continues to violate, the FLSA, 29 U.S.C. §§ 201 *et seq.* The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

163.    Due to Defendant's FLSA violations, Plaintiff is entitled to recover from the Defendant compensation for unpaid overtime wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees and costs of this action pursuant to 29 U.S.C. § 216(b).

**WHEREFORE**, the Plaintiff prays judgment against these Defendants herein for relief specified above in this complaint together with:

A.  For any and all prospective and injunctive relief available, to include what has been described in this Complaint;

B.  Actual, consequential, and compensatory damages to be found fair and equitable within the discretion of the fact finder;

C.  For punitive damages against individual Defendants Barron and Smith, found by clear and convincing evidence within both the discretion of the fact finder and the Court;

D.  For all damages and equitable relief allowed under Title VII, § 1983 and Title IX as the Court may deem just and proper to include actual and compensatory damages;

E.  For reasonable attorneys' fees allowed and available under Title VII, § 1983 and Title IX;

F.  Restitution and payment of wages due and owed and/or improperly withheld by Defendant Clemson University in accordance with the PWA and/or FLSA to include but not limited to treble or liquidated damages and/or costs and attorneys' fees; and

G.  For any further relief as this Court may deem just and proper.

[SIGNATURE PAGE FOLLOWS]

Respectfully Submitted:

S/ John G. Reckenbeil
John G. Reckenbeil, SC Bar No. 68610
LAW OFFICE OF JOHN G. RECKENBEIL, LLC
Post Office Box 314
Mauldin, SC  29662
Phone: (864) 248-0436
Fax: (864) 326-5940
Email: john@johnreckenbeillaw.com

Jeffrey D. Ezell, SC Bar No. 011877
EZELL LAW FIRM LLC
15 N. Irvine Street
Greenville, SC 29601
Phone: (864) 421-0015
Email: jeff@jeffezelllawfirm.com

Dated: May 16, 2019
Greenville, South Carolina

STATE OF SOUTH CAROLINA )
                              )         IN THE COURT OF COMMON PLEAS

COUNTY OF OCONEE )
                              )

Bradley Hieronymus, )
                              )

         Plaintiff, )

vs. )                        **VERIFICATION**
                              )

Felix Barron, Ph.D., individually and in his )
official capacity as an employee of Clemson )
University; Alesia Smith, Executive Director )
for Equity Compliance/Title IX Coordinator, )
in her individual capacity and in her official )
capacity as an employee of Clemson )
University; Clemson University; and the )
Board of Trustees of Clemson University, )
                              )

         Defendants. )
_____ )

     I, Bradley Hieronymus, appearing first before the Notary Public, state that I am the Plaintiff in this above-captioned case. I have read the complaint, and the allegations are true, accurate and authentic to the best of my recollection.

                                            _____
                                            Bradley Hieronymus

SWORN to before me this 15th
day of May, 2019.

_____ (SEAL)
Notary Public for South Carolina
My Commission expires: 12/08/2025